# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,            )
                             )
            Plaintiff,        )
                             )
    v.                       )     Cr. ID. No. 1305011774A
                             )
                             )
DARRELL COLEMAN              )
                             )
            Defendant.        )

Date Submitted: April 1, 2019
Date Decided: April 23, 2019

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF

Martin B. O'Connor, Deputy Attorney General, Delaware Department of Justice, 820 N. French St. 7th Floor, Wilmington, Delaware, 19801. Attorney for the State.

Patrick J. Collins, Esquire. COLLINS & ASSOCIATES, 716 North Tatnall Street, Suite 300, Wilmington, Delaware, 19801. Attorney for Defendant.

**MANNING**, Judge:[1]

---

[1] Sitting by designation as a Commissioner of the Superior Court pursuant to an Order signed by the Chief Justice, October 26, 2018; Del. Const. Art. IV, § 38 and 29 *Del. C.* § 5610.

This 23rd day of April 2019, upon consideration of defendant Darrell Coleman's Motion for Postconviction Relief, I find and recommend the following:

## Facts and Procedural History

Coleman was convicted in the Superior Court following a jury trial on June 7, 2016, of Murder in the First Degree and Possession of a Firearm by a Person Prohibited. Coleman's conviction was upheld by the Delaware Supreme Court on direct appeal. The facts surrounding the trial and conviction, as found by the Delaware Supreme Court in its decision upholding the conviction, are as follows:

> As part of a planned visitation, J.R. [Marvin Moore Jr.] spent May 12, 2013 with his father, Marvin Moore, at Moore's residence at Riverside in Wilmington. Moore was expected to return J.R. to his mother that evening. In the hours leading up to the time Moore was to do so, he and Coleman, who was then the boyfriend of J.R.'s mother, exchanged numerous phone calls. Finally, they arranged for Moore to drop J.R. off at a Wawa near Memorial Drive in New Castle. Moore drove toward the Wawa with J.R. and two of Moore's friends, Tierra Battles and Dearius Riley, stopping first at the home of another friend near the Wawa. As they approached the friend's home, Moore could be heard on the phone angrily telling a male voice on the other end that he was not going to let him pick up his son. After they arrived at the friend's home, they decided that Battles and Riley would take J.R. over to the Wawa while Moore remained at the friend's house.
>
> When Battles and Riley arrived at the Wawa with J.R., Coleman was there. Battles asked Coleman where J.R.'s mother was, and Coleman asked Battles where Moore was. They then began arguing. J.R. got in Coleman's vehicle, and Coleman followed Battles back to her vehicle to continue arguing. At one point, Coleman said: "Tell Marvin next time Marvin say something crazy out his mouth I be at his front door." Riley asked if Coleman wanted him to go get Moore, and

1

Coleman replied: "No. If Marvin was a man, Marvin would have come down." Coleman then departed the Wawa with J.R. while Battles and Riley returned to the friend's house.

When told about the confrontation, Moore responded: "I'm sorry, but I got to go take care of my business,' and he was going to go meet [Coleman] to fight." Moore, Battles, and Riley then drove back to Riverside, during which time Moore and Coleman were "snapping over the phone" in a "heated" conversation. Finally, Moore and Coleman arranged to meet near Peralta's Market in Riverside, which was about a block and a half away from Moore's residence. When Coleman arrived, he backed his vehicle down a one-way street and parked near Peralta's Market. While traveling back to Riverside, Riley overheard Moore say on the phone: "You already at the corner store, so I'll be there in a little bit."

After Moore, Battles, and Riley arrived back at Moore's house, Moore walked to the sidewalk across the street from Peralta's Market. Coleman then got out of his vehicle and ran diagonally back across the street between two cars. Moore was then shot. Coleman ran back to his car and took off. When police arrived at the scene, they determined that Moore had one gunshot wound to the jaw and another one to his chest. He also had an unfired revolver between his thighs.

Michelle Pflaumer, from the Children's Advocacy Center, interviewed J.R. on May 13, 2013. J.R. discussed the previous day's activities during his visitation with his father. He discussed being driven to a gas station by Battles and Riley and being picked up by Coleman. Initially, J.R. told Pflaumer that Coleman took him to his mother's home to sleep, but J.R. eventually said that Coleman took him to the vicinity of his father's home in Riverside. He said that while seated in Coleman's vehicle, he saw Coleman shoot his father.

The Wilmington Police were unable to locate Coleman in Delaware. As a result, they enlisted the help of the U.S. Marshals Service, which apprehended Coleman in Newark, New Jersey on May 31, 2013. In October of the same year, Coleman was indicted by a grand jury on charges of Murder in the First Degree, Possession of a Firearm

2

During the Commission of a Felony, and Possession of a Firearm by a Person Prohibited.

Trial commenced on October 20, 2014 and lasted five days. J.R. was called as a witness by the State. On direct examination, he discussed some events of the day and evening of the murder, but did not mention, and was not directly asked, about seeing the shooting itself. At the conclusion of his direct examination, the State moved for the admission of his prior out-of-court statement under § 3507. Coleman objected on the grounds that the State had not laid an adequate foundation because J.R.'s testimony did not touch on the shooting. The trial court overruled the objection, and the statement was played for the jury.

[The Delaware Supreme Court upheld Coleman's conviction on the grounds] that the other evidence of Coleman's guilt [was] so overwhelming that any error in the admission of J.R.'s out-of-court statement, if any, was harmless beyond a reasonable doubt. This evidence included testimony from both Battles and Riley regarding the heated exchanges between Coleman and Moore, which ultimately led to the arranged rendezvous at Peralta's Market. A Riverside resident testified that after she heard gunshots, she saw a man with dreadlocks run to a dark colored sedan that sped away from the area. A police officer also testified regarding the inability to locate Coleman within Delaware and his ultimate apprehension in Newark, New Jersey. Another police officer testified that the murder weapon, which was also admitted as evidence, was found two days after the murder on the northbound catwalk (toward New Jersey) of the Delaware Memorial Bridge.

The State also introduced physical evidence. This included surveillance video of: (1) Battles and Riley handing J.R. over to Coleman at the Wawa; (2) Coleman arriving at Peralta's Market; and (3) Coleman starting to leave Peralta's Market, stopping, running over to where Moore's body was later found, and running back to his car before fleeing. Additionally, the State introduced phone records that documented twenty calls between Coleman and Moore before the murder. Those records also showed that Coleman stopped calling

3

Moore and turned his phone off after the shooting. Further, the State produced cell phone tower maps that tracked Coleman's movement to Wawa and then to Peralta's Market. The State also admitted Coleman's mug shot showing that at the time of his arrest he still had dreadlocks like the man seen running from the shooting and in the surveillance videos. This evidence not only corroborated J.R.'s statement but also corroborated the live testimony.[2]

Coleman filed the instant motion, *pro se*, pursuant to Superior Court Criminal Rule 61, on July 5, 2016.[3] The motion was subsequently referred to the undersigned judicial officer. Rule 61 Counsel (hereinafter "Counsel") was appointed on July 18, 2016. Due to a shortage of available attorneys, Patrick Collins was not appointed as Counsel until January 12, 2017. An initial briefing schedule was issued on January 24, 2017. At trial, Coleman was represented by Timothy Weiler (hereinafter "Trial Counsel"). Counsel filed an Amended Motion for Postconviction Relief (hereinafter the "Motion") on July 25, 2017. Trial Counsel filed his Affidavit, responding to Defendant's Rule 61 claims, on August 23, 2017. The State filed its Response on September 22, 2017. Coleman filed a Reply on October 27, 2017.

After reviewing the issues raised in Coleman's Motion, I exercised my discretion and ordered an evidentiary hearing pursuant to Rule 61(h), principally related to the testimony offered at trial by the State's ballistics expert, Carl Rone.

---

[2] *Coleman v. State*, 2016 WL 3387192, 141 A.3rd 1037 (unpublished decision) (Del. 2016).

[3] Docket Item (hereinafter "D.I.") #94.

4

Shortly thereafter, it was learned that Rone had been fired by the Delaware State Police and charged with a number of crimes for falsifying time sheets. At the request of Counsel, the evidentiary hearing was delayed a number of times so the investigation could run its course. Ultimately, the evidentiary hearing was held on August 22, 2018, and November 30, 2018. Neither side elected to call Rone as a witness at the hearing, presumably due to the pending legal case against him. At the hearing, Coleman testify on his own behalf and the State called Trial Counsel as its only witness in rebuttal. Following a delay to obtain transcripts, post-hearing briefs were filed by Coleman on January 23, 2019,[4] and by the State on April 1, 2019.[5] Coleman also filed an Appendix to his Post-Hearing Memorandum that contains transcript and other exhibits.[6]

---

[4] D.I. #124.

[5] D.I. #127.

[6] D.I. #125 (Appendix cited herein after as "Axxx").

Coleman's claims for postconviction relief, as stated in the Amended Motion,[7] are as follows:

Claim One: Trial Counsel was ineffective for failing to challenge the firearm/toolmark evidence, resulting in constitutional prejudice to Mr. Coleman.

Ground Two: Trial Counsel was ineffective for failing to litigate a Rule 609 motion, resulting in prejudice to Mr. Coleman.

As I will outline in greater detail below, the arguments put forth by Coleman during the evidentiary hearing changed substantially from what was asserted in the Amended Motion.

## Legal Standard

To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged *Strickland* test by showing that: (1) counsel performed at a level "below an objective standard of reasonableness" and that, (2) the deficient performance prejudiced the defense.[8] The first prong requires a defendant to show by a preponderance of the evidence that defense counsel was not reasonably competent, while the second prong requires the defendant to show that there is a

---

[7] D.I. #108.

[8] *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

6

reasonable probability that, but for defense counsel's unprofessional errors, the outcome of the proceedings would have been different.[9]

When a court examines a claim of ineffective assistance of counsel, it may address either prong first; where one prong is not met, the claim may be rejected without contemplating the other prong.[10] Mere allegations of ineffectiveness will not suffice—a defendant must make and substantiate concrete allegations of actual prejudice.[11] An error by defense counsel, even if professionally unreasonable, does not warrant setting aside the judgment of conviction if the error had no effect on the judgment.[12]

In considering post-trial attacks on counsel, *Strickland* cautions that trial counsel's performance should be viewed from his or her perspective at the time decisions were being made.[13] A fair assessment of attorney performance requires that every effort is made to eliminate the distorting efforts of hindsight. Second guessing or "Monday morning quarterbacking" should be avoided.[14]

---

[9] *Id.*

[10] *Id.* at 697.

[11] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).

[12] *Strickland*, 466 U.S. at 691.

[13] *Id.*

[14] *Id.*

## Analysis

The procedural requirements of Rule 61 must be addressed before considering the merits of any argument.[15] Coleman's Motion was timely filed and is not repetitive, thus satisfying the procedural requirements of Rule 61. Therefore, the Motion should be decided on its merits.

### Claim One

Coleman claims Trial Counsel was ineffective because he failed to adequately challenge the ballistics evidence offered by the State at trial through Rone's testimony. Specifically, Rone testified the five spent 9mm cartridge casings, recovered from the scene of the crime had been fired from the 9mm handgun later recovered by police on the Delaware Memorial Bridge. However, Rone could not say if the two spent bullets (i.e. the actual projectiles) recovered from the victim had been fired from the same 9mm handgun in light of their damaged condition.[16] At trial, Rone did opine that the two bullets recovered from the victim were in the same "class" or family of ammunition that included 9mm, .380 and .357 calibers. Rone could not definitively state the exact caliber of the two recovered bullets due to their damaged condition.[17]

---

[15] *See Younger*, 580 A.2d at 554.

[16] D.I. #108 (Appendix to Amended Motion at A412).

[17] *Id.* at A421.

8

In support of his argument attacking Rone's conclusions, Coleman presented an expert report by Frederick M. Wentling, a Firearm and Tool Mark Examiner.[18] Wentling opined that Rone, in essence, went too far in his testimony. Specifically, Wentling opined that the bullets recovered from the victim were most likely .38 caliber, which will not fire from a 9mm handgun. Additionally, Wentling noted that 9mm bullets are normally metal jacketed but the projectiles recovered from the victim were not. Wentling also opined that he believed that the bullets recovered from the victim were similar to a UMC brand .38 caliber that is normally used in revolvers. Finally, Wentling opined that the bullets recovered from the victim had been discharged from a heavily worn or oversized barrel, a trait the recovered 9mm handgun did not appear to display.

As to the unfired handgun recovered by police from the victim, Wentling noted one of the cartridges displayed a light firing pin mark, and a second cartridge displayed two light indent firing pin marks. Rone's report also noted the firing pin marks. Wentling opined that these marks evidenced that the handgun (a revolver) was previously attempted to be fired three times without actually discharging a projectile. Wentling expressed no opinion as to when this might have occurred or exactly why.

---

[18] D.I. #109 (Appendix to Amended Motion at A727).

Coleman argues, in his Motion, that Trial Counsel was ineffective because he failed to challenge Rone's testimony and failed to point out to the jury the fact that an attempt to fire the gun found with the victim had been made at some point in time. Coleman argues that this second piece of evidence would have bolstered a self-defense claim, and Trial Counsel's failure to properly and fully argue it, prejudiced Coleman to an extent that there is a probability that the outcome of the trial would have been different.

At trial, Coleman did not testify in his own defense. Nevertheless, Trial Counsel did receive a self-defense jury instruction and did ask the jury to consider it. However, during the majority of his closing argument, Trial Counsel focused his attack on the fact that there was no evidence that Coleman had actually possessed or fired the 9mm handgun and that of the at least four separate DNA samples recovered from the gun, none of them matched Coleman.

It appears Trial Counsel made the best argument to the jury he could—reasonable doubt. For this reason, I do not find that Trial Counsel's failure to argue that the firing pin marks somehow proved that Coleman acted in self-defense prejudiced Coleman, under the circumstances. Although in hindsight, this was probably the better strategy, as discussed in more detail below, Coleman's decision hamstrung Trial Counsel's ability to make the best possible argument.

10

Any failure of Trial Counsel to attack Rone's ballistic conclusions was rendered moot once Coleman testified at the evidentiary hearing. Rather than pursue the argument presented as Claim One of the Motion at the evidentiary hearing, Coleman testified and chose to present an entirely new theory as to why Trial Counsel was ineffective.

At the evidentiary hear, Coleman testified that he had a very poor relationship with Trial Counsel, that he lied to Trial Counsel about what actually happened and that the two of them never discussed the possibility of asserting self-defense.[19] In fact, Mr. Coleman testified that he did not know what a self-defense claim was, and had been told by someone in the prison law library that Delaware did not have a self-defense law. Coleman stated that his "lawyer wasn't speaking to me about anything." Additionally, Coleman denied that Trial Counsel advised him that it would have been helpful for him to testify to establish a self-defense claim.[20] Coleman further admitted lying to Trial Counsel when he told him he was at the scene of the crime but did not shoot anymore. [21]

Coleman testified, in details remarkably similar to what the State had established during the trial, as to the events leading up the shooting. Coleman

---

[19] I.D. #125 at A743-744 (Appended to Post-Hearing Memorandum).

[20] *Id.*

[21] *Id.*

11

admitted that he did in fact confronted Moore. Coleman testified that the two of them exchanged words, but that Moore pulled a gun out and aimed it at him. Coleman testified that he then pulled out his own gun and shot Moore.[22] Coleman stated that he feared Moore was going to shoot him. Coleman confirmed that J.R. was in the car when the shooting occurred, along with a previously undisclosed individual named only "Mooder." Coleman confirmed that he fled to New Jersey and attempted to toss the gun off of the Delaware Memorial Bridge after removing the magazine from the gun.[23] Coleman testified that he was scared and did not want to be stopped with the gun in his possession. Coleman testified that he was not aware that Moore had died until weeks later. Finally, Coleman confirmed that this was the testimony he would have offered had he testified at his original trial.[24]

Based on my review of the record, Coleman's argument that Trial Counsel did not adequately communicate with him and that he was unaware that Delaware has a self-defense law is wholly unconvincing.

Coleman's assertions about Trial Counsel's lack of representation is belied by the record. As pointed out in the State's Response, records indicate that Trial Counsel visited Coleman prior to trial, on at least eight occasions. Additionally,

---

[22] *Id. at A760.*

[23] *Id.* at A761.

[24] *Id.* at A764.

Trial Counsel logged two video-phone interviews with Coleman and mailed him at least forty items of discovery or letters. Most importantly, Coleman's claim that Trial Counsel never discussed the right to self-defense with him is disproven upon review of the letters sent to Coleman and the contemporaneous notes made by Trial Counsel after speaking with Coleman.

Specifically, on December 19, 2003, Trial Counsel wrote Coleman a detailed letter explaining how the evidence did not support an "identity" defense and that the State was actually *expecting* a self-defense argument due to the fact that the victim was found with a loaded gun between his legs.[25] Moreover, on August 21, 2014, Trial Counsel and Coleman spoke via video-phone. Trial Counsel's notes indicate that "[Coleman] does not want self-defense." On November 11, 2014, six weeks before trial, Trial Counsel wrote Coleman a third letter, informing him in no uncertain terms, that "[t]he most viable defense to you (although not 100% perfect) is that you acted in self-defense… [and] that YOU BELIEVED the use of deadly force was justified because YOU believed [it] was necessary for the purpose of protecting yourself."[26] Trial Counsel also mailed Coleman a copy of *Guttierrez v.*

---

[25] D.I. #127 at Exhibit A.

[26] D.I. #127 at p. 9 and Exhibit C.

*State*, 842 A.2d 650 (Del. 2004), a case that explained the law of self-defense in Delaware.

At the evidentiary hearing, Trial Counsel testified that Coleman was "pretty adamant" that "he was not present at the crime scene" for most of the representation. However, as trial approached, Coleman did finally admit to Trial Counsel that "he was there [at the crime scene] but didn't shoot anybody." [27] At no point did Coleman ever tell Trial Counsel that Moore had a gun or pointed it at him.

There are a number of problems with Coleman's belated self-defense testimony. First, it cannot—and indeed has not—been corroborated by any other witness. Second, it is notable that Coleman did not offer any testimony during the evidentiary hearing to establish that Moore had actually attempted to fire his gun after pointing it at him. This notable omission makes the fact that two of the cartridges in Moore's gun had firing-pin indentations considerably less compelling. Finally, as noted by the experts during trial, there is no way to know when the firing pin indentations were actually made.

Additionally, as pointed out by the State in its Response to Defendant's Post-Hearing Memorandum, Coleman's belated claim of self-defense presupposes that the jury would have even found it credible.[28] Indeed, the jury was presented with

---

[27] I.D. #125 at A782-783 (Appended to Post-Hearing Memorandum).

[28] I.D. #127.

the option to convict on multiple lesser included offenses and Trial Counsel concluded his summation by arguing the law of self-defense to the jury. [29] In the end, the jury rejected all of these options by its guilty verdict.

The law requires that there is a "reasonable probability" that the outcome of the case would have been different but for Trial Counsel's allegedly deficient performance. Under *Strickland*, the "probability" of a different outcome does not mean a mere "possibility"—it is a higher standard. In *Neal v. State*, the Delaware Supreme Court expounded on the *Strickland* burden of proof analysis under the prejudice prong, it held:

> A reasonable probability of a different result requires a probability sufficient to undermine confidence in the outcome. Although this standard is not mathematically precise and does not necessarily require a showing of more likely than not, *Strickland* requires more than a showing merely that the conduct could have or might have or it is possible that it would have led to a different result. The likelihood of a different result must be substantial, not just conceivable. [30]

Trial Counsel certainly could have made better use of the firing pin evidence to support a self-defense claim, but without Coleman's testimony, the most important piece of such an argument was still missing. [31]

---

[29] A628.

[30] *Neal v. State*, 80 A.3d 935, 942 (Del. 2013) (internal quotations and citations omitted).

[31] Based on his testimony during the evidentiary hearing, it is unclear if Trial Counsel was aware of the firing pin mark evidence at the time of the trial. Trial Counsel testified that he could not

Thus, the operative question becomes would the jury have acquitted Coleman if they were also presented the firing pin evidence?[32] In my view, the answer is still *most likely* no. I do recognize there is a *possibility* Coleman might have been acquitted, but there is not a reasonable *probability* of it as required under *Strickland*.

The record in this case is abundantly clear that Trial Counsel recognized self-defense as the best trial strategy and communicated this fact to Coleman on numerous occasions. Inexplicably, Coleman refused to head Trial Counsel's advice and assist in presenting this defense. It was Coleman's obstinacy that prevented Trial Counsel from making the very best argument he could for his client—not his deficient performance. Under these circumstances, even if Trial Counsel was deficient for not *also* presenting the jury with the firing-pin evidence, I cannot say to the required level certainty that it prejudiced Coleman and undermined the reliability of the verdict.

recall, but that "if I had, I certainly would have brought it up." A805. In any event, there is no doubt that Trial Counsel did not argue it to the jury.

[32] Or, at a minimum, convicted him on some lesser-included offense.

## Claim Two

Coleman's second argument is that he did not testify at his first trial "because he thought if the jury heard about his 2004 drug dealing conviction, they would think he was guilty because they thought he was a felon." [33] More specifically, Coleman argues that Trial Counsel's performance was deficient because he did not file a Rule 609 motion to obtain a definitive ruling from the trial judge before Coleman made his election not to testify.

In his January 23, 2019, Post-Hearing Memorandum, Coleman seems to bootstrap Claim One and Claim two. Coleman makes the argument that because Trial Counsel could not conclusively advise him as to the admissibility of the 2004 conviction, he decided not to testify and was, therefore, denied the opportunity to present his self-defense claim.

It strains credulity to believe that even if Coleman had been told prior to trial that the 2004 conviction would not be used against him, he would have suddenly changed his *long-held* position and finally admitted to Trial Counsel that he shot Moore in self-defense. As recognized by Counsel in his Post-Hearing Memorandum, "Coleman did not make things easy for [Trial Counsel] pretrial, because he held back crucial information from his attorney." [34] It is clear from the

---

[33] D.I. # 124 at p.13.

[34] D.I. #124 at p.12.

17

Evidentiary Hearing testimony that Trial Counsel and Coleman were not very communicative during the trial itself and never had a "come to Jesus" meeting as the evidence against Coleman mounted. However, even if they did, there is nothing in the record, other than Coleman's self-serving testimony during the evidentiary hearing, to indicate that Coleman would have suddenly realized that Trial Counsel had been correct all along and that he should head his advice. In fact, based on the October 13, 2014, letter sent to Coleman by Trial Counsel, it is evident that Coleman had at one point in time actually planned to testify at his trial, but changed his mind at some point. In the letter, Trial Counsel listed a number of things for Coleman to consider when making his decision to testify—his prior conviction not being one of them. There is nothing in the record to indicate that Coleman was concerned about his prior conviction prior to trial—this argument only came to light by Counsel during the post-conviction phase of the case.

Coleman's argument is predicated on the premise that he elected not to testify based *solely* on the unresolved 609 issue. However, what is far more likely—as evidenced by Trial Counsel's letter—is that Coleman was more concerned that his story of merely being present at the scene of the crime would not have held up very well under intense cross-examination. Additionally, it is important to note that by the time Coleman elected not to testify he had the opportunity to see the State's entire case against him—which was indeed overwhelming.

Undoubtedly, it is certainly the best practice to litigate questions of evidence admissibility prior to trial or making other strategy-related decisions. However, I find it hard to fault Trial Counsel under the unique circumstance of this case. Although Trial Counsel's failure to litigate the admissibility of the 2004 conviction was not the best practice, I find that it did not result in prejudice to Coleman because this failure alone was unlikely to have changed the outcome of the trial as required under *Strickland*. The evidence simply does not support Coleman's argument that he would have testified—and been acquitted—*but for* Trial Counsel's failure to litigate the 609 issue.

## Conclusion

Coleman's claims of ineffective assistance of counsel should be **DENIED**.

**IT IS SO RECOMMENDED.**

Bradley V. Manning,
Judge

OC:    Prothonotary
cc:    Counsel via e-mail

19